## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| EMERGENCY HOSPITAL SYSTEMS, LLC,[1] | § | CASE NO. 24-34683 |
| | § | |
| | § | |
| DEBTOR. | § | |

### DEBTOR'S BRIEF IN RESPONSE TO MOPARTY FAMILY LIMITED PARTNERSHIP AND KARE FAMILY LIMITED PARTNERSHIP LTD'S JOINT SUPPLEMENTAL BRIEF ON AUTHORITY

Debtor Emergency Hospital Systems, LLC ("Debtor" or "EHS") files its Brief in Response to Moparty Family Limited Partnership ("Moparty") and Kare Family Limited Partnership LTD's ("KARE") (collectively "Movants") Joint Supplemental Brief on Authority (Dkt. 66). This Court has requested additional briefing related to Dr. Rafael Delaflor-Weiss's ("Delaflor") authority to file a Chapter 11 bankruptcy petition for Emergency Hospital Systems, LLC, thus Debtor respectfully shows as follows:

### ARGUMENT

**A. The Company Agreement Impliedly Grants the Operating Manager the Authority to File Bankruptcy.**

As EHS' Operating Manager, Delaflor has the authority to file bankruptcy for EHS. In their Joint Supplemental Brief, Movants repeat the same arguments they have previously made. In their eyes, Delaflor's position as Operating Manager does not give him the authority to file bankruptcy on behalf of EHS, and his choice to do so is the act of a "managerial dictator." (Dkt.

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of its federal tax identification number, is Emergency Hospital Systems, LLC a/k/a Cleveland Emergency Hospital and d/b/a Cleveland Emergency Hospital. The Debtor's mailing address is 8901 FM 1960 Bypass Road, Humble, Texas 77338.

1

66, Supplemental Brief at 2). However, this interpretation is a complete misreading of the role of the Operating Manager, bankruptcy law, and the laws of the state of Texas.

Delaflor acted through the broad authority vested to him by the Company Agreement in his role as Operating Manager when filing bankruptcy petition on EHS' behalf.  EHS' Second Amended and Restated Company Agreement (the "Company Agreement") is the document that describes how EHS shall be governed. (Dkt. 53-5, Company Agreement) Specifically, Section 7 of the Company Agreement, titled "Governance," states that management and control of EHS is vested in the Board of Managers. *Id.* at § 7.1.1. However, an Operating Manager is appointed by a Super-Majority of that Board. *Id.* at § 7.7.1. The Board delegates to that Operating Manager the "powers and duties to manage the day-to-day operations of the Company." *Id.* at § 7.7.6 (a). As of January 01, 2024, that Operating Manager is Dr. Rafael Delaflor-Weiss. *Id.* at § 7.7.1.

The Company Agreement does not give an exhaustive list of EHS' day-to-day operations, but instead states that "[d]ay-to-day operations include, **but are not limited to**, the authority to…" followed by a demonstrative list of powers. *Id.*   The Operating Manager's duties and rights include: (i) the authority to bind and act as an agent of the Company to third parties and outside affairs, (ii) authorizing EHS executives to enter contracts, agreements, and "other undertakings that are necessary or advisable for conducting Company's affairs or business." *Id.* at § 7.7.6 (a)(i), (vii). Notably, the Company Agreement bestows the Operating Manager with the authority to exercise his powers "to negotiate, execute and perform, **on any terms deemed desirable within the Operating Manager's sole discretion**, such agreements, contracts, leases, instruments and other documents as the Operating Manager shall from time to time approve in accordance with, and subject to, the terms of this Agreement…" *Id.* at § 7.7.6 (a) (viii). The filing of a bankruptcy (or any litigation for that matter) falls within the Operating Manager's authority to act as an agent

of EHS in relation to outside affairs. It also falls under the Operating Manager's authority to engage in any undertakings necessary or advisable for conducting EHS' affairs or business. As Movants' own counsel noted at the hearing on October 24, 2024, given the Operating Manager's broad discretion and authority to run the company, it would be impossible to list every task delegated to the Operating Manager. In other words, it would be impractical to list all the various ways the Operating Manager could "act as an agent towards outside affairs." Indeed, as written, that description does not say *exactly* what the Operating Manager can do; instead, it is a sweeping grant of authority that includes an array of possibilities, including the filing of bankruptcy.

It should be noted, however, that nothing in the Company Agreement *specifically* vests any of EHS' Managers or Officers with the ability to file bankruptcy. Indeed, the only mention of bankruptcy in the entire document is in regard to the restricting of voting rights of a manager if an order is entered against them for relief under any part of the Federal Bankruptcy Code. *Id.* at § 7.3(c). However, it is the Company Agreement's broad grant of authority to the Operating Manager that places the ability to file bankruptcy squarely in Delaflor's powers.

EHS has recently been placed in severe financial turmoil over exorbitant rental fees charged by two of its managers, Ravi Moparty and Roy Moparty. These fees have put EHS in a position where the costs of performing its daily operations simply cannot be met. As the Company Agreement defines Delaflor's rights and duties as being to oversee and manage the daily operations of EHS, the filing of a petition to ensure those operations continue would certainly fall under his authority.

### B.  According to the Case Law, the Company Agreement Controls.

Admittedly, there is no case that directly addresses the question before the Court, which is whether the Company Agreement authorizes Delaflor to file this bankruptcy. The reason for

that is because there is no case adjudicating this exact Company Agreement.  What is evident from the case law is that the language of the applicable company agreement controls.

Bankruptcy courts have found that managers have authority to file bankruptcy when the governing documents provide a broad grant of power, such as here.  *In re Lexington* is a case in which debtor Lexington Hospitality Group, LLC's ("LHG") company manager, Janee Hotel Corporation ("Janee"), filed for Chapter 11 relief after the company defaulted on a note. *In Re Lexington Hospitality Group, LLC*, 577 B.R. 676, 681-82 (Bankr. E.D. Ky. 2017).  The financer of the note, PCG Credit Partners, LLC ("PCG"), filed a motion to dismiss the bankruptcy, arguing, among other things, that the company's amended operating agreement and the provision of Kentucky's Limited Liability Company Act did not allow the company manager the authority to file the bankruptcy. *Id.* at 679, 682. The Court looked to both LHG's amended operating agreement and Kentucky state law to determine the scope of the manager's authority. As the court explained, "[s]tate law governs whether a business entity is authorized to file a bankruptcy petition." *Id.* (*citing In re East End Dev.*, LLC, 491 B.R. 633, 638 (Bankr. E.D. N.Y. 2013)); *In re D & W Ltd.*, LLC, 467 B.R. 427, 432 (Bankr. E.D. Mich. 2012); *In re ComScape Telecomms., Inc.*, 423 B.R. 816, 830 (Bankr. S.D. Ohio 2010).

In analyzing the terms of the amended operating agreement, the court first looked to the authority given to the company manager under the operating agreement's article on "Management and Control of the Company." *Id.* at 686. That section gave the company manager broad authority to "manage the business and affairs of the Company," and includes a specific list of what constitutes day-to-day operations. *Id.*  Unlike the case at hand, the amended version of the operating agreement included a limitation on LHG's ability to file bankruptcy, which the court held was unenforceable under the bankruptcy restrictions. *Id.* at 684-86. PCG attempted to argue

4

that the authority of the company manager is limited to these day-to-day operations and that a filing of bankruptcy does not constitute day-to-day operations. *Id.* However, the court found that Section 3.1(a) vested broad authority to the company manager, and that beyond the unenforceable restrictive bankruptcy provision, no provision of the amended operating agreement spoke on the company manager's authority to file bankruptcy. *Id.*

Looking to Kentucky state laws on matters where the operating agreement was silent, the Court held that Kentucky's statutes supported the manager's authority to file bankruptcy as well. *Id.* at 686-87 (citing *Chapman v. Reg'l Radiology Assocs., PLLC*, No. 2010-CA-00131-MR, 2011 WL 1085999, at *6–7 (Ky. Ct. App. Mar. 25, 2011)). Section 275.165 and 275.175 of the Kentucky Act granted "broad parameters of a manager's authority in a manager-managed limited liability company" to manage the affairs and business of the organization. *Id.* (citing K.R.S. § 275.165, § 275.175). Ultimately, the Court found that the company manager had authority to file the bankruptcy, explaining that, "[f]iling bankruptcy may be outside the ordinary course, but it is a business decision and **is connected to the business affairs** of the Company. Thus, Janee had authority under the Amended Operating Agreement and the Kentucky Act to file the petition for LHG." *Id.* (emphasis added).

In another similar case, *In re East End Development, LLC*,[2] 21 West Water Street Holdings, Inc. ("21 West"), an interest holder in debtor East End Development LLC ("East End"), attempted to dismiss a chapter 11 petition filed by East End's managing member MM Sag Harbor LLC ("MM Sag Harbor") by arguing that they lacked authority to file. *In re East End Dev., LLC*, 491 B.R. 633, 635 (Bankr. E.D.N.Y. 2013). As in *Lexington*, the Court looked to East End's operating agreement to see what authority was vested in MM Sag Harbor as the managing

---

[2] A copy of this case is attached hereto as Ex. 1.

member. *Id.* at 636-37. Section 5.4 of that operating agreement stated that the managing member will manage East End's business and affairs and would be given all the necessary powers to carry out East End's business. *Id.* Some of the powers listed by the agreement, included, but were not limited to, the ability to "to cause the Debtor to acquire, own, operate, manage, develop, maintain, the Debtor's assets, to sell the condominium units or otherwise sell all or any part of the Properties and other ... Assets of the [Debtor] ... upon such terms and conditions as the Managing Member from time to time may determine" and "to perform any and all acts it deems necessary or appropriate for the protection and preservation of the [Debtor's assets and property]." *Id.*

While the agreement did not specifically address bankruptcy, it did place restrictions upon the power of the managing member to enter into agreements that would involve the dissolution or consolidation of the entity. *Id.* In determining if the managing member had authority to file bankruptcy, the Court noted that, "[t]he Supreme Court has opined that with respect to corporations, the entity vested with 'the power of management' has the requisite authority to file a bankruptcy petition." *Id.* at 638 (citing *Price v. Gurney*, 324 U.S. 100, 104, 65 S.Ct. 513, 89 L.Ed. 776 (1945)). The Court also looked at state law to determine whether a business entity has the authority to file a bankruptcy petition. *Id.* (citing *In re Am. Globus Corp.*, 195 B.R. 263, 265 (Bankr. S.D.N.Y. 1996) and *In re Avalon Hotel Partners, LLC*, 302 B.R. 377, 380 (Bankr. D. Or. 2003)). As East End was a New York limited liability company, the Court analyzed New York law. *Id.* at 639. However, both the operating agreement and New York LLC laws did not specify "what type of consent is required by the members of an LLC prior to filing a petition in bankruptcy." *Id.* Rather than accept 21 West's argument that the bankruptcy is an act akin to a windup or liquidation that requires consent of other members beyond the Managing Member, the

Court instead found that the authority to file bankruptcy was include in the company agreement's broad grant of power to the managing member. Specifically, the Court explained:

> "The Operating Agreement confers broad powers upon the Managing Member to act on behalf of the Debtor, and the examples set forth in the Operating Agreement are merely illustrative. In contrast, the actions for which the Managing Member must obtain the consent of 21 West are narrow and specific. The Operating Agreement consistently confers upon the Managing Member the authority to take many acts, whether day-to-day, or one solitary act, in order to preserve the value of the Debtor's assets and to further its business operations. The Operating Agreement is clear and unambiguous, and there are no grounds in this case to speculate whether the parties meant to include the act of filing bankruptcy as one of the events requiring the consent of 21 West."

*Id.* at 639-40.

Ultimately, the Court found that the operating agreement did not "restrict the Managing Member's authority to file a petition in bankruptcy on behalf of the Debtor." *Id.* at 640. The Court concluded that, "[b]ased on the language of the Operating Agreement, and **the clear intent to give the Managing Member broad authority to act on behalf of the Debtor and to bind third parties with respect to the Debtor**, the Court finds that the Managing Member had the authority to file the petition for relief under Chapter 11." *Id.* (emphasis added).

Here, as with *Lexington* and *East End*, the Company Agreement vests Delaflor with broad authority in his rights and duties. *In re Lexington*, 577 B.R. at 686; Dkt. 53-5 at § 7.7.6(a). Both Janee and Delaflor were entrusted with overseeing the day-to-day operations of their entity. *Id.* However, unlike in the case at hand, the amended operating agreement in *Lexington* included a provision attempting to limit Janee's ability to file bankruptcy. *Lexington*, 577 B.R.R. at 684-86. Notably, EHS' Company Agreement does not place any restrictions on the Operating Manager's ability to exercise his authority, as Delaflor may exercise his powers on any terms he desires. (Ex. 53-5 § 7.7.6(a)(viii). The list of Delaflor's duties is non-exclusive, as the Company Agreement states that the day-to-day operations to which the Operating Manager is to oversee "include, but

are not limited to, the authority to…" Dkt. 53-5 § 7.7.6(a). Furthermore, Delaflor is given **sole discretion** to exercise his powers and duties. *Id.* at § 7.7.6(viii). It is difficult to think of a more expansive grant of power than those afforded to Delaflor in the Company Agreement. While the court in *Lexington* may have found that the act of filing bankruptcy constitutes an act that is outside the "ordinary course of business," the powers assigned to the Operating Manager by the terms of the Company Agreement here make it so that they fall squarely under the managerial duties of the position. *Lexington*, 577 B.R. at 686.

Specifically, the Company Agreement lists off the "day-to-day operations" that Delaflor manages as including such things as the ability "(i) bind and otherwise act as an agent of the Company in relation to third parties and outside affairs," "(vii) authorize Company executives to enter into, **make and perform any contracts, agreements, and other undertakings that are necessary or advisable for conducting Company's affairs or business**" and "(viii) in the exercise of any of the foregoing powers, to negotiate, execute and perform, **on any terms deemed desirable within the Operating Manager's sole discretion, such agreements, contracts, leases, instruments and other documents** as the Operating Manager shall from time to time approve in accordance with, and subject to, the terms of this Agreement…" *Id.* It should also be noted once more that this list does not include all the powers of the Operating Manager. But even of those listed, Delaflor is still authorized to execute a wide variety of documents, on his own terms and **sole discretion**, and allow EHS' executives to pursue undertakings that are **necessary** for conducting the Company's affairs and business. *Id.* And in filing for bankruptcy to save EHS' operations, Delaflor has done exactly that.

Many similarities also exist between this case and *East End*.  In both cases, the company agreement grants broad powers to the manager. And in both instances, the company agreements

8

have only a narrow class of actions for which that manager needs to seek consent from other managers before taking. *East End*, 491 B.R. at 640. Here, those actions fall under the "major decision" section of the Company Agreement. Dkt. 53-5 § 7.1.2. However, this list only has a select number of acts, with the Company Agreement stating that "for the purposes of this Agreement, the term "[m]ajor decisions" means…" *Id.* Among that list, bankruptcy is not mentioned. *Id.* Indeed, no explicit reference is made in the Company Agreement as to how bankruptcy, or any litigation, should be filed. Furthermore, the court in *East End* concluded that, based upon the operating agreement's language, which conferred broad authority to the managing member and "to bind third parties with respect to the Debtor," the managing member had authority to file bankruptcy. *In re East End*, 491 B.R. at 640. EHS' Company Agreement is similar in that it gives the Operating Manager the authority to "bind and otherwise act as an agent of the Company in relation to third parties and outside affairs." Dkt. 53-5 § 7.7.6(a)(i). Thus, it is abundantly evident that the Operating Manager was meant to oversee such matters with third parties, including bankruptcy, as part of the day-to-day operations of EHS.

If the Court is concerned that the EHS agreement is silent on bankruptcy, Texas state law also supports a finding that Delaflor has authority to file bankruptcy. EHS is a Texas limited liability company, and its Company Agreement specifically states that it must be "construed in accordance with the laws of the State of Texas," thus this Texas law applies. Dkt. 53-5 § 12.12. Much like Kentucky law or New York law, Texas law grants broad authority to managers, such as Delaflor, in the exercise of their powers. However, the Texas Business Organizations Code ("TBOC") does not specifically address what consent is required prior to the filing of a bankruptcy. Rather, TBOC states that the governing authority of a limited liability company is "(1) the managers of the company, if the company agreement provides that the company is

managed by one or more managers." TEX. BUS. ORGS. CODE § 101.251. Governing authority is defined by the Business Organization Code as:

> "a person or group of persons who are entitled to manage and direct the affairs of an entity under this code and the governing documents of the entity, except that if the governing documents of the entity or this code divide the authority to manage and direct the affairs of the entity among different persons or groups of persons according to different matters, "governing authority" means the person or group of persons entitled to manage and direct the affairs of the entity with respect to a matter under the governing documents of the entity or this code."

*Id.* at § 1.002 35(A).

TBOC further provides that the "governing authority of a limited liability company shall direct the management of the business and affairs of the company and exercise or authorize the exercise of the powers of the company as provided by (1) the company agreement; and (2) this title and the provisions of Title 1 applicable to a limited liability company to the extent that the company agreement does not provide for the management of the company." *Id.* at § 101.252.

Within EHS' Company Agreement, Delaflor has been granted "the powers and duties to manage day-to-day operations of the Company." Dkt. 53-5 § 7.7.6(a). However, as previously noted, neither the Company Agreement nor TBOC specifically address what authority is needed to file bankruptcy.  However, there are Texas cases construing managers' authority to file suit. In *Penny v. El Patio, LLC*, an LLC's operating agreement granted its operating managers "all powers and rights necessary, proper, convenient or advisable to effectuate and carry out the purposes, business and objectives of the Company, and to maximize Company profits." *Penny v. El Patio, LLC*, 466 S.W.3d 914, 919 (Tex. App.—Austin 2015, pet. denied). In response to an argument that the operating manager did not have the authority to file suit on the LLC's behalf, the Court looked to language of the company agreement. *Id.* at 920-21. Given the broad authority granted to the operating manager by the aforementioned language of the operating agreement, the

court concluded that the operating manager did have authority to file suit, as the filing of a lawsuit against those who misappropriated the LLC's funds was "necessary, proper, and advisable for the motel's business, objectives, and profits." *Id.* at 921 (emphasis added). The powers of the operating manager in *Penny* and Delaflor's powers are strikingly similar, as both have been given wide authority carry out their duties as operating manager.

The Company Agreement authorizes Delaflor to file bankruptcy. The Company Agreement does not limit Delaflor's authority as the Operating Manager to a specific list, and it instead vests him with a wide range of powers, including the authority to bind and act as an agent of EHS in third party affairs in any way he deems desirable within his sole discretion. Dkt. 53-5 § 7.7.6(a)(i). Delaflor used his discretion, and he determined found that filing bankruptcy was necessary to maintain EHS' day-to-day operations due to a cash crisis caused the exorbitant rents charge by the Moparty managers. Accordingly, Delaflor, as the Operating Manager, had authority to file bankruptcy.

### C. Movants' Cited Cases Are Distinguishable, Because the Operating Agreements in Those Cases Contain Restrictions That Do Not Exist Here.

As noted, Movants' brief largely recounts cases they have cited in other briefs, which are distinguishable given the language of the company agreements at issue. It is the movant who shoulders the burden of proving that a dismissal of a bankruptcy petition is warranted, and Movants have failed to carry that burden. *East End*, 491 B.R. at 682-83, citing *In re Oregon Homes*, LLC, No. 13-33349, 2014 WL 4794861, at *2 (Bankr. N.D. Ohio Sept. 25, 2014).

In their brief, Movants discuss both *Lexington* and *East End*, but their interpretations are flawed. Movants argue that the language in the company agreements of the debtors in those cases suggest that it is the board of managers who should have authority to enter into bankruptcy. Dkt. 66, Movants' Supp. Brief at 5. However, this interpretation ignores the similarities between the

managers in those cases and Delaflor: Delaflor, Janee, and MM Sag Harbor were all managers whose managerial role had been set apart from the others, and the relevant company agreements delegated them the powers to oversee and manage that company's operations. *In re Lexington*, 577 B.R. at 678-79; *In re East End*, 491 B.R. at 637-38; Dkt. 53-5§ 7.7.6(a). The similar language of all three agreements grants a wide, and in Delaflor's case, unexhausted, list of powers and duties to the operating manager. *Id.* In all instances, the powers to oversee and manage the entity gave the manager the authority to file bankruptcy. *Id.*

Movants' cited cases are readily distinguishable, primarily because of the different levels of power granted to the managers in the various operating or company agreements. For instance, Movants relied upon *In re DB Capital* to argue that the filing of bankruptcy represents a radical departure from a company's normal business operations. Dkt. 66, Movants' Supp. Brief at 7. However, while the bankruptcy court in *DB Capital* ultimately found that DB Management lacked authority to file bankruptcy, DB Capital's operating agreement was far more restrictive than EHS', as it specifically required unanimous written consent for "any act that would make it impossible to carry on the ordinary business of the Company." *In re DB Capital Holdings, LLC*, 463 B.R. 142 (Table), 2010 WL 4925811, at *5 (10th Cir. BAP Dec. 6, 2010). EHS' Company Agreement places no such restriction upon Delaflor.

Movants also rely upon *In re Karben Brewing LLC*, which again differs significantly from the case at hand. In *Karben*, the Court was asked to decide whether managers who oversaw day-to-day business of an organization had authority to file bankruptcy. *In re Karben Brewing*, LLC, 661 B.R. 392, 396-97 (Bankr. W.D. Wis. 2024). But again, the operating agreement in that case placed far more restrictions upon the actions of the managers, as it required "[a]ny activity or event ... which requires a vote or decision of the Members **including all day-to-day management**

decisions shall be made by majority consent ... unless this Agreement otherwise delegates that vote or decision to Managers or requires unanimous consent." *Id.* at 396. In comparison, Delaflor's management of the day-to-day operations of EHS need no vote or consent for him to act, as the exercising of his powers is solely within his discretion. Dkt. 53-5, § 7.7.6 (a)(viii). As the powers of the management positions of the two cases are vastly different, the holding in *In re* is inapposite.

Another case, *In re Arkco*, involves the president of a company who took a number of manipulative acts to grant himself essentially sole authority to operate the company, including waiving the notice requirements of the shareholder's annual meetings, amending the company's bylaws, and shrinking the number of the company's directors from three to one. *In re Arko Dev., Inc.,* No. 96-20352 S, 1997 WL 160386, at *1 (Bankr. E.D. Ark. Mar. 31, 1997). Ultimately, the Court found that the president's actions were "outside the bounds of the law and the by-laws under which Arkco and the subsidiary corporations are governed." *Id.* at 4. Thus, "[i]n light of the invalidity of his actions taken as president, his "authorization," as a director of the subsidiaries, to file the bankruptcies was not valid." *Id.* at 5. No such situation exists here. Delaflor has taken no action to increase the power given to him by the Company Agreement or to limit the powers allowed to the other managers. Delaflor has simply used the powers granted to him by the Company Agreement to ensure its day-to-day operations may continue.

Two other cases referenced by Movants, *In re AT Engineering, Inc.* and *In re Cabernet Holdings, LLC*, are quite similar to one another, but not to EHS' situation. Both deal with a limited liability company where one of the two owners of the company, each with a 50% interest in the company, filed a bankruptcy proceeding without the consent of the other owner. *In re AT Engineering, Inc.*, 138 B.R. 285, 286-87 (Bankr. M.D. Fla. 1992); *In re Cabernet Holdings, LLC,*

No. 10-50602C-11W, 2010 WL 2540116, at *1–2 (Bankr. M.D.N.C. June 21, 2010). In both instances, the courts found that consent was required to be given to the other owner before the filing of bankruptcy. *In re AT Engineering, Inc.*, 138 B.R. at 287; *In re Cabernet Holdings, LLC*, 2010 WL at *1-2. However, in neither of these cases was there an operating agreement conferring either manager with the type of broad authority and discretion that Delaflor has under the EHS Company Agreement.  The Company Agreement places no consent requirement, or any other limit, on the Operating Manager's exercise of his powers. Even Movants' reliance on Texas state law is misplaced, as their argument that the Operating Manager cannot have the power to file bankruptcy as it is "an action of a limited liability company not apparently for carrying out the ordinary course of business" completely ignores that Delaflor's sole reason for filing this bankruptcy is to carry out, and ensure the survival of, the EHS' normal business operations. Regardless, TBOC makes it clear that the Company Agreement controls. TEX. BUS. ORGS. CODE §§101.052(a), 101.251, 101.252.

Ultimately, the language Company Agreement is the key to determining whether Delaflor as Operating Manager has authority to file bankruptcy. As discussed, EHS' Company Agreement provides an extremely broad grant of power to the Operating Manager. What distinguishes EHS' Agreement from those discussed in other cases is the non-exhaustive list of the Operating Manager's power to oversee EHS' day-to-day operations, including the ability to bind EHS to third parties, to engage in any undertaking necessary for EHS' operations, and to manage all outside affairs in a manner that the Operating Manager determines, within his sole discretion, to be desirable. Dkt. 53-5, § 7.7.6 (a)(i), (vii), and (viii). Delaflor properly exercised that authority when he filed this bankruptcy on behalf of EHS.

## <u>CONCLUSION</u>

For these reasons, Debtor prays that the Court deny Moparty Family Limited Partnership and KARE Family Limited Partnership LTD's Emergency Motion to Dismiss Unauthorized Chapter 11 Petition and Related Adversary Proceeding.

Respectfully submitted,

KEAN MILLER, PLLC

*/s/ Megan Rapp*
Megan Rapp
Texas Bar No. 24073924
Federal Bar No. 1260209
megan.rapp@keanmiller.com
1400 Woodloch Forest Drive, Suite 400
The Woodlands, Texas 77380
(832) 494-1711
(888) 781-0162– Facsimile

SEILER RAPP & GUERRA, PLLC

*/s/ Kenna M. Seiler*
Kenna M. Seiler
State Bar No. 13944250
Southern District Bar No. 16468
kseiler@srg-law.com
2700 Research Forest Drive, Suite 100
The Woodlands, Texas 77381
(281) 419-7770
(346) 223-0283– Facsimile

PROPOSED COUNSEL FOR
EMERGENCY HOSPITAL SYSTEMS,
LLC

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 7, 2024, a true and correct copy of this document was served via this Court's ECF notification system or United States first-class mail to (a) the Office of the United States Trustee for the Southern District of Texas (b) the holders of the twenty (20) largest unsecured claims against the Debtors on an aggregate basis; and (c) those parties requesting notice pursuant to Bankruptcy Rule 2002, as listed on the attached list.

*/s/ Megan Rapp*
Megan Rapp

16